IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-00086-01-CR-W-BP |
| ) | |
| ROBERT L. MORGAN, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Morgan's Motion to Suppress Evidence (Doc. #22). For the reasons set forth below, it is recommended that the portion of the motion seeking the suppression of statements defendant made at the scene, which statements were made in response to questioning initiated by law enforcement officers, be granted. The remainder of the motion should be denied.

I. INTRODUCTION

On March 7, 2017, the grand jury returned a one-count indictment against defendant Robert L. Morgan. The indictment charges that on or about August 20, 2015, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm.

On August 7, 2018, an evidentiary hearing was held on defendant's motion to suppress. Defendant Morgan was represented by Assistant Federal Public Defender William J. Raymond. The Government was represented by Assistant United States Attorney Joseph M. Marquez. The Government called Officer John Mahoney, Sergeant Dawn Jones, and Officer Justin Kirmse

of the Kansas City, Missouri Police Department as witnesses. The defense called Daniel G. Hernandez to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On August 20, 2015, at approximately 3:18 p.m., a dispatch was sent across the airwaves regarding a 911 call. (Tr. at 3) The dispatch stated that three black males, one armed with a rifle, got out of a white Mustang with Missouri license plate AH4 S5E and ran into a residence at 2454 Poplar. (Tr. at 3; Defendant's Ex. 2) At 3:21 p.m., there was a comment from dispatch that the black male who was armed with the rifle was wearing a turquoise shirt and that the Mustang was a convertible. (Tr. at 3; Defendant's Ex. 2) Officer John Mahoney testified that a dispatch sent out over the air to everyone alerts all the officers to whatever is going on in that area so that any officer who is close by could respond. (Tr. at 4) In addition, if any officers have any information regarding the dispatch, they can offer that information. (Tr. at 4) At 3:22 p.m., Officer Mahoney got on the air and announced that that vehicle had participated in a residential burglary.[1] (Tr. at 4; Defendant's Ex. 2)

2. Sergeant (then Detective) Dawn Jones was driving when she heard the two dispatches and then the information offered by Officer Mahoney. (Tr. at 14) Sergeant Jones understood Officer Mahoney's announcement to mean that he had arrived on scene at 2454 Poplar and that there was a burglary. (Tr. at 20) Sergeant Jones was in the area of 27th and Van Brunt, just a few blocks (seven or eight) away from 2454 Poplar, when she observed a white Mustang convertible. (Tr. at 5, 14-15, 17-18) Sergeant Jones estimated that it would take one to two minutes to drive from 2454 Poplar to 27th and Van Brunt. (Tr. at 18) At 3:23 p.m., Sergeant Jones put the information out over the air that she had observed the vehicle and that she was getting in a position to conduct a car check so that officers in the area would provide back-up at that location. (Tr. at 15; Defendant's Ex. 2) Sergeant Jones testified that she stopped the vehicle because it matched the description[2] and it was in very close proximity to the call. (Tr. at 16) Sergeant Jones' vehicle was not equipped with a police computer; she only had a police radio. (Tr. at 15, 25) Sergeant Jones testified that she did not commit to memory

---

[1] At the time of the hearing, Officer Mahoney could not recall any specifics regarding the residential burglary that he referenced on August 20, 2015, but he testified that on August 20, 2015, he would have believed the information he gave was pertinent. (Tr. at 10-12)

[2] The white Mustang Sergeant Jones stopped had Missouri license plate FK5 D6X with two people in it, one Hispanic male and one black male. (Tr. at 22-23)

2

the license plate that was dispatched over the radio. (Tr. at 25) Sergeant Jones further testified that what she understood from the dispatch was that there were multiple occupants in the white Mustang convertible. (Tr. at 26) Sergeant Jones summed up her reasons for stopping the vehicle in which defendant Morgan was a passenger as follows:

> As a human, I heard the information. I observed a white Mustang, which is a convertible. That's not necessarily a common vehicle. And it was in very close proximity to a felony I believed to have been committed. So I conducted a car check just to investigate the crime.

(Tr. at 26)

3. Sergeant Jones explained that felony car stops are used in high-risk situations when officers believe a vehicle has been involved in a felony. (Tr. at 16, 28) Officers stop the subject vehicle and use the engine blocks and doorframes of police vehicles to provide cover to protect the officers. (Tr. at 16) Officers then verbally give instructions, such as turn the vehicle off and put your hands outside the window. (Tr. at 16) Next, officers call out occupants from the subject vehicle one at a time, starting with the driver. (Tr. at 16) The occupants are to back towards the officers. (Tr. at 16) The occupants are then told to lie on the ground. (Tr. at 17) After all the occupants are out of the vehicle and on the ground, the officers will advance on the occupants and get them into handcuffs. (Tr. at 17) This procedure is in place for the safety of both officers and occupants of vehicles. (Tr. at 17)

4. This procedure was used by officers in conducting the stop of the white Mustang convertible. (Tr. at 17) Sergeant Jones initiated the stop and used her own car as cover. (Tr. at 16-17) Sergeant Jones testified that two or three other officers assisted her once she initiated the car stop. (Tr. at 16) Commands were made for the driver to get out of the vehicle and walk back towards the officers. (Tr. at 17) The passenger was then asked to get out and walk back towards the officers. (Tr. at 17)

5. Officer Justin Kirmse was one of the officers who responded to Sergeant Jones' call for back-up on the felony car stop. (Tr. at 29) Officer Kirmse testified that a felony car stop was necessary because the information which was broadcast was about parties armed. (Tr. at 32-33) When Officer Kirmse arrived on the scene, other officers were already there with their guns drawn. (Tr. at 33) One of the officers on scene was giving verbal commands for the occupants of the vehicle to exit. (Tr. at 33) The passenger of the vehicle obeyed verbal commands and walked backwards to where Officer Kirmse was standing. (Tr. at 35) At that point, Officer Kirmse placed the passenger in handcuffs for officer safety, given the nature of the call. (Tr. at 35) The passenger advised that he had a firearm on him.

3

(Tr. at 36) Officer Kirmse removed a semi-automatic handgun from the passenger's right hip. (Tr. at 36, 38) The passenger then advised that he had another handgun magazine in his back right pocket. (Tr. at 37) Officer Kirmse recovered the magazine. (Tr. at 37) At that point, Officer Kirmse had the passenger sit down on the curb while officers conducted their investigation. (Tr. at 37)

6. Officer Kirmse testified that "once things are under control and the scene is safe, we begin to look into people's names, date of birth, vehicle information, follow-up information on what was received in the call." (Tr. at 37) In this case, after the scene was determined to be safe, Officer Kirmse obtained the passenger's name, Robert Morgan, his date of birth and his identifiers. (Tr. at 38) With this information, officers usually run a person through dispatch and through their police computer to see if the person has any prior felony convictions. (Tr. at 38) Prior to receiving information through dispatch or through the computer, Officer Kirmse asked Morgan if he had ever been arrested. (Tr. at 41) Morgan responded that he had in fact been arrested and that he had been to prison, but that it was a long time ago. (Tr. at 41) Officer Kirmse cannot recall if he specifically asked Morgan if he was a felon. (Tr. at 52) Officer Kirmse testified that he asked these questions as part of a normal conversation he was having with Morgan. (Tr. at 38) Officer Kirmse never read Morgan his <u>Miranda</u> rights. (Tr. at 50) Officer Kirmse testified, "We don't Mirandize people in the field. Usually that's the detectives when they conduct the interrogation." (Tr. at 50)

7. Another officer ran Robert Morgan through the computer and determined that he was a convicted felon. (Tr. at 38) Officer Kirmse contacted the detectives in the Illegal Firearms Squad and was told to place Morgan on a 24-hour investigative hold for investigation of a felon in possession of a firearm. (Tr. at 38-39) Officer Kirmse placed Morgan under arrest for being a felon in possession of a firearm. (Tr. at 17, 40) Officer Kirmse searched Morgan before transporting him and found a baggie with about 3.1 grams of marijuana in his left rear pocket. (Tr. at 52-53) Morgan was transported for booking. (Tr. at 40)

8. Daniel Hernandez was the driver of the white Mustang convertible that was stopped on August 20, 2015. (Tr. at 54) Mr. Hernandez and defendant Morgan worked at Anthony's Restaurant at 7th and Grand, Kansas City, Missouri. (Tr. at 55) They had gotten off work at 3:00. (Tr. at 57-58) Mr. Hernandez was giving Morgan a ride home. (Tr. at 58) Mr. Hernandez testified that the officers did not tell him why he was stopped until he and defendant Morgan were sitting on the curb. (Tr. at 60) The officers never told Mr. Hernandez that they had stopped the wrong car. (Tr. at 60) Mr. Hernandez was released at the scene. (Tr. at 41)

4

III.  DISCUSSION

Defendant seeks to suppress all evidence and statements resulting from an unlawful seizure. Defendant provided the following argument in support of his motion:

> … The officers did not have reasonable suspicion to stop Mr. Morgan, nor did they have probable cause to arrest him. The anonymous 911 call did not indicate that any criminal activity had occurred and lacked sufficient reliability to support reasonable suspicion or probable cause. Lacking reasonable suspicion or probable cause, the officers could not legally frisk Mr. Morgan and seize his firearm. Even if the frisk was lawful, which Mr. Morgan does not concede, it is not illegal to carry a firearm in Missouri, even one that is concealed, therefore the officers could not extend the duration of the stop or arrest Mr. Morgan on the basis that he possessed a firearm.
>
> Finally, the officers interrogated Mr. Morgan while he was in custody without informing him of his *Miranda* rights. The statements must be suppressed as a result of the *Miranda* violation, but also because the officers did not start questioning Mr. Morgan until *after* they had determined they had arrested the wrong people.[3] Once the officers determined they had the wrong people, Mr. Morgan should have been free to go. Furthermore, incriminating statements obtained in violation of *Miranda* cannot be used to prolong a detention or as a basis for arrest.

(Motion to Suppress Evidence (Doc. #22) at 2.)

    A.    The Constitutionality of the Stop

Both investigative stops and arrests are seizures. However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause. See Terry v. Ohio, 392 U.S. 1, 25-31 (1968). In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. See United States v. Montgomery, 828 F.3d 741, 743-44 (8th Cir. 2016).

---

[3] No evidence was presented at the hearing regarding when a determination was made that Mr. Hernandez and defendant Morgan were not the parties referenced in the 911 call.

The record in this case establishes that at approximately 3:18 p.m., on August 20, 2015, a dispatch was sent out with respect to a 911 call that three black males, one armed with a rifle, got out of a white Mustang with Missouri license plate AH4 S5E and ran into a residence at 2454 Poplar. (Fact No. 1) At 3:21 p.m., there was a comment from dispatch that the black male who was armed with the rifle was wearing a turquoise shirt and that the Mustang was a convertible. (Id.) At 3:22 p.m., Officer John Mahoney got on the air and announced that that vehicle had participated in a residential burglary. (Id.) Sergeant (then Detective) Dawn Jones was driving when she heard the two dispatches and then the information offered by Officer Mahoney. (Fact No. 2) Sergeant Jones' vehicle was not equipped with a police computer, only a police radio, and she did not commit to memory the license plate that was dispatched over the radio. (Id.) Sergeant Jones testified that what she understood from the dispatch was that there were multiple occupants in the white Mustang convertible. (Id.) Sergeant Jones testified that she understood Officer Mahoney's announcement to mean that he had arrived on scene at 2454 Poplar and that there was a burglary. (Id.) Sergeant Jones was in the area of 27th and Van Brunt, just a few blocks away from 2454 Poplar, when she observed a white Mustang convertible. (Id.) Sergeant Jones estimated that it would take one to two minutes to drive from 2454 Poplar to 27th and Van Brunt. (Id.) At 3:23 p.m., Sergeant Jones announced that she had observed the vehicle and was going to conduct a car check. (Id.) Sergeant Jones testified that she stopped the vehicle in which defendant Morgan was a passenger to investigate because it was a white Mustang convertible, not a common vehicle, in very close proximity to the burglary crime that she believed had just been committed. (Id.)

Sergeant Jones was mistaken in her belief regarding Officer Mahoney's announcement. Sergeant Jones was also mistaken in her belief that the white Mustang convertible she stopped

fully matched the description given by dispatch. However, a reasonable belief, even if it is mistaken, can justify an investigative stop. See United States v. Trogdon, 789 F.3d 907, 912-13 (8th Cir. 2015)(officers' mistaken belief that no-trespassing sign was posted on property was reasonable given that business owner told city that he had posted no-trespassing sign, even though no sign was actually posted, and justified investigative stop for trespassing); United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005)(officer reasonably believed that defendant was pretending to use inoperable pay phone while casing area or waiting to deal drugs; thus, reasonable suspicion for investigative stop existed even though unbeknown to officer regular service had been restored to phone and defendant was indeed talking on phone); United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003)(officer's reasonable, but mistaken, belief that assault was imminent justified officer seizing defendant and investigating situation).

The Court finds that Sergeant Jones had a reasonable, although mistaken, suspicion that the occupants of the white Mustang convertible who she pulled over had just been involved in a residential burglary given Sergeant Jones' interpretation of the announcement made by Officer Mahoney, the description of the vehicle provided by dispatch (which Sergeant Jones only heard over the radio as opposed to being able to read and double check on a computer), and the temporal and geographic proximity of the vehicle to the residence where Sergeant Jones believed the burglary had taken place. Thus, the Court finds that Sergeant Jones was justified in conducting an investigative stop. See United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015)(officer had reasonable suspicion to stop vehicle where vehicle matched description given by dispatch of suspect's vehicle and close temporal and physical proximity of vehicle to reported crime); United States v. Roberts, 787 F.3d 1204, 1209-10 (8th Cir. 2015)(same).

B.   The Seizure of Defendant Morgan

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)(citing United States v. Jones, 759 F.2d 633, 636-37 (8th Cir.), cert. denied, 474 U.S. 837 (1985)). A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous. See Terry v. Ohio, 392 U.S. 1, 30 (1968). Protective measures also allow for the use of handcuffs. See United States v. Morgan, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009); United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006), cert. denied 549 U.S. 1272 (2007).

Sergeant Jones initiated a felony car stop. (Fact No. 4) Felony car stops are used in high-risk situations. (Fact No. 3) The officers involved in the car stop felt this was a high-risk situation given the information which had been broadcast about the parties being armed. (Fact No. 5) Given that the officers believed that the occupants of the vehicle had just been involved in a burglary and that there was a weapon in the vehicle, the officers had a credible concern for officer safety. The officers' actions in bringing each person out of the vehicle and handcuffing them were reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether the occupants of the vehicle had engaged in criminal activity. As defendant Morgan was being handcuffed, he told Officer Kirmse that he had a firearm on him. (Fact No. 5) Officer Kirmse removed a semi-automatic handgun from Morgan's right hip. (Id.) Morgan then advised that he had another handgun magazine in his

8

pocket. (Id.) Officer Kirmse recovered the magazine. (Id.) No constitutional violation took place.

      C.      <u>Statements at the Scene</u>

Defendant Morgan argues that the officers interrogated him at the scene without informing him of his *Miranda* rights. (Motion to Suppress Evidence (Doc. #22) at 2.) *Miranda* warnings are required when there is a "custodial interrogation," which is defined by the Supreme Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). In <u>United States v. Ray</u>, 690 F. App'x 366, 368 (6th Cir. 2017), defendant Ray was handcuffed while officers executed a search warrant at his residence. Several firearms were discovered in the residence. <u>Id.</u> One of the officers asked Ray if he had been to jail before and Ray replied that he had been to federal prison. <u>Id.</u> The court found:

> Even this brief and cursory exchange amounted to a custodial interrogation that required *Miranda* warnings. <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980)("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent. … A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").
>
>     For starters, there is no dispute that Ray was handcuffed at the time and, thus, "in custody" for *Miranda* purposes. … And asking a suspect whether he had a criminal record … certainly amounts to "express questioning" that "police should know is reasonably likely to evoke an incriminating response." <u>See</u> <u>Innis</u>, 446 U.S. at 300-01 ….

690 F. App'x at 372. <u>Accord</u> <u>United States v. Martinez</u>, 462 F.3d 903, 910 (8th Cir. 2006), <u>cert. denied</u>, 549 U.S. 1272 (2007); <u>United States v. Butler</u>, No. 4:16-00108-CR-RK, 2017 WL 6089072, at *6 (W.D. Mo. Dec. 7, 2017).

After Officer Kirmse had recovered the handgun and magazine from defendant Morgan,

9

Officer Kirmse asked Morgan if he had ever been arrested and possibly whether he was a felon. (Fact No. 6) Morgan responded that he had in fact been arrested and that he had been to prison. (Id.) The Court finds that defendant Morgan's statements came about as a result of questions posed by an officer after Morgan was handcuffed and thus, "in custody" for *Miranda* purposes. The Court finds that defendant Morgan's statements regarding prior arrests and prison time, as well as any other statements defendant made at the scene which were made in response to questioning initiated by law enforcement officers, should be suppressed.

### D. The Arrest of Defendant Morgan

After the scene was determined to be safe, the officers began conducting their investigation. (Fact No. 6) Officer Kirmse obtained defendant Morgan's name, his date of birth, and his identifiers. (Id.) An officer ran Morgan's information through the computer. (Fact No. 7) The Court finds that the officers did not run defendant Morgan through the computer because of any statements Morgan made to Officer Kirmse, rather the officers were merely following their usual routine and standard practices. (Fact No. 6) After running Morgan's information through the computer, it was determined that he was a convicted felon. (Fact No. 7) Defendant Morgan was then placed under arrest for being a felon in possession of a firearm. (Id.) There was no constitutional violation.

### E. Fruit of the Poisonous Tree

Finally, defendant Morgan argues that because the police violated the Fourth Amendment when they stopped the vehicle in which he was a passenger, all physical evidence, as well as any statements Morgan made at the scene[4] and at the police station, must be suppressed as fruit of the

---

[4] As set forth above, it is recommended that defendant Morgan's statements at the scene be suppressed on other grounds.

poisonous tree. (Motion to Suppress Evidence (Doc. #22) at 7.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and verbal evidence obtained directly or indirectly through the exploitation of police illegality. See <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that the investigative stop and the seizure of defendant were lawful. Therefore, defendant's fruit of the poisonous tree argument must fail.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part and denying in part defendant Morgan's Motion to Suppress Evidence (Doc. #22). The portion of the motion seeking the suppression of statements defendant made at the scene, which statements were made in response to questioning initiated by law enforcement officers, should be granted. The remainder of the motion should be denied.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE